IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SPANISH FORT WATER SYSTEM,         )<br>       Plaintiff,                                                   )<br>                                                                        )<br>v.                                                                    )   CASE NO. 1:22-cv-210-KD-M<br>                                                                        )<br>NORTH BALDWIN UTILITIES,                  )<br>       Defendants.                                             ) | |

**ORDER**

This action is before the Court on the Complaint and Motion for Preliminary Injunction filed by Plaintiff Spanish Fort Water System ("Spanish Fort"), the Answer and Response in Opposition to Motion for Preliminary Injunction filed by Defendant North Baldwin Utilities ("NBU"), and the parties' post-hearing briefs. Docs. 1, 2, 12, 13, 21, 23, 27. The motion was heard July 5, 2022. Upon consideration of the motion, response, post-hearing briefs, and the evidence presented at the hearing, and for the reasons set forth herein, the Motion for Preliminary Injunction (doc 2) is **DENIED**.

**I.      Factual Background**

This litigation stems from a dispute between Spanish Fort, an Alabama non-profit corporation and rural service provider, and NBU, a public utility company that supplies water, natural gas, and sewer services to customers in Baldwin County, Alabama. Doc. 1, p. 1.

On August 20, 2003, Spanish Fort entered into a contract with NBU whereby NBU reserved 200,000 gallons of water for Spanish Fort's use and Spanish Fort promised to purchase a minimum of 50,000 gallons on a daily basis for fifteen (15) years. Doc. 2, p. 17, Aff. Of John T. Evans ¶ 8. In this contract, both parties agreed to delineate areas where Spanish Fort or NBU would provide service to customers exclusively, with one additional area determined to be

unrestricted and available to either party. Id. at ¶ 10. The dividing line between the service area reserved to each party was Stroh Road, such that NBU had the exclusive right to service customers north of Stroh Road and Spanish Fort had the exclusive right to service customers south of Stroh Road. Id. Today, Spanish Fort owns, operates, and maintains a water distribution system in Baldwin County that serves over 3700 customers in that area. Id. at ¶ 3-4.

In 2011, Spanish Fort applied for a loan from the United States Department of Agriculture's Rural Development section (USDARD) to finance the construction and improvement of its infrastructure and facilities. Id. at ¶ 5. This loan was approved pursuant to 7 U.S.C. §1926(a) of the Consolidated Farm and Rural Development Act (CFRDA), which authorizes the Secretary of Agriculture to "make or insure loans to associations, including corporations not operated for profit, Indian tribes on Federal and State reservations and other federally recognized Indian tribes, and public and quasi-public agencies" in order to finance "specific projects for works for the development, storage, treatment, purification, or distribution of water or the collection, treatment, or disposal of waste in rural areas." 7 U.S.C. §1926. This loan was closed on September 20, 2013, for the amount of $6,703,207.00 with interest at an annual rate of 3.5%. Doc. 2, p. 17, Aff. Of John T. Evans ¶ 5. The 2003 contract, by its own terms, expired in 2018, but was still in effect when Spanish Fort received the USDARD loan in 2013. Id. at ¶ 11. Today, Spanish Fort remains indebted to the USDARD with the final installment due on September 20, 2053. Id. at ¶ 7.

On May 27, 2022, Spanish Fort filed a complaint for declaratory and injunctive relief, claiming that NBU was running water lines to a subdivision development – Brentwood – that is just south of Stroh Road and is allegedly a part of Spanish Fort's exclusive service area. Doc. 1, p. 1. Spanish Fort asserts that NBU's physical intrusion of its alleged service area violates

§1926(b) of the CFRDA. The CFRDA safeguards water associations and the federal loans given to them by protecting USDARD loan recipient(s) against curtailment or limitation of the services it provides by competitors. Id.

      Specifically, §1926(b) sets forth, in relevant part, as follows:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. §1926(b).

      In response, NBU claims that the Brentwood development is not within Spanish Fort's exclusive service area. First, NBU points out that the contract dividing the service areas has expired. NBU argues that Spanish Fort did not acquire any permanent rights to service the area south of Stroh Road via the expired contract.

      Next, NBU argues that pursuant to §1926(b), Brentwood is not within Spanish Fort's service area. NBU argues a protected service area is any area where Spanish Fort "has provided or made service available." And because Spanish Fort has not provided service to Brentwood and has no ability to provide service within a reasonable time, Brentwood is not within Spanish Fort's protected service area.

      In support, NBU points out that over two years ago Brentwood developers requested service from Spanish Fort, but Spanish Fort has yet to upgrade its infrastructure to meet the needs of the Brentwood development. Specifically, in January 2020, Sawgrass – the engineer of record for the Brentwood development area – approached Spanish Fort about serving the Brentwood development and, on January 14, 2020, Spanish Fort issued a letter of availability for

water service. After the letter was issued, Sawgrass conducted engineering work to determine the "scope and scale" of the project, at which time it was found that Spanish Fort maintained a three-inch water line in place located near the proposed development site. This three-inch water line was found to be insufficient to serve the development's water needs, which require six-inch and eight-inch water lines.

In May 2021, after concluding a series of discussions about potentially providing water service to the Brentwood development, Spanish Fort informed Sawgrass that it would not agree to fund or make improvements to its system to bring sufficient water to the area. Instead, Spanish Fort indicated that the developer would have to provide the improvements but failed to ever give the specifics about how to connect the extension to Spanish Fort's ten-inch water main. The developer estimates the costs as over $100,000 to provide the infrastructure needed.

Thereafter, NBU informed Sawgrass that the territory lines had expired and that it could provide the water service to Brentwood.  On June 1, 2021, NBU issued a letter of availability to Sawgrass, and, in September 2021, NBU installed an approximately thirty-foot section of twelve-inch line under Stroh Road to the entrance of the development, which is just south of Stroh Road. The developer incurred no charge from NBU. This line was connected to water lines that had been installed in the subdivision by Sawgrass. As of the date of the hearing, NBU had not installed any taps, since construction of the homes in the Brentwood development had not yet begun.

In response to NBU's claim that Spanish Fort is unable to provide water service to the Brentwood development area, Spanish Fort asserts that it has the adequate infrastructure and facilities to provide water service to the Brentwood development and is able to provide such service within a commercially reasonable time and at a commercially reasonable cost.

Specifically, Spanish Fort asserts that it owns and maintains water lines on properties adjacent to the Brentwood development; that it has sufficient water capacity to serve the Brentwood development; that it has the technical capability of providing sufficiently-sized piping to the Brentwood development; and that it currently provides water to commercial and residential properties near the Brentwood development area and could expand its lines to reach the Brentwood development area within a commercially reasonable time and for a commercially reasonable cost. Spanish Fort estimates that the costs to the developer would be $70,000 - $80,000.[1]

Spanish Fort further alleges that NBU, by inserting its own water pipes "underneath and intertwined" with already-existing Spanish Fort lines, threatens the safety and security of Spanish Fort's pipes; makes repairs, adjustments, replacements, expansions, and extensions more complex, expensive, and risky; and increases the risk of unavailability or delayed availability of Spanish Fort services to existing customers.

## II.   Discussion

A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017) (quoting Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc)); McDonald's Corporation v. Robertson, 147 F. 3d 1301, 1307 (11th Cir. 1998) (same). "A

---

[1] This was an estimated cost for an alternative route. The Court finds the developer's estimate to be more reliable.

preliminary injunction is an 'extraordinary and drastic remedy' and should not be granted unless 'the movant clearly establishe[s] the "burden of persuasion" as to each of the four prerequisites.'" FF Cosmetics FL, Inc., 866 F.3d at 1298 (quoting McDonald's Corp., 147 F.3d at 1306).[2]

### A. Likelihood of success on the merits

To establish a violation of §1926(b), a plaintiff must prove three elements. First, plaintiff must show that, at the time the curtailment is alleged, plaintiff was indebted to the Department of Agriculture. Second, plaintiff must show that plaintiff "provided or made service available" to the area in dispute. Third, plaintiff must show that a competing entity curtailed or limited service in that area.

Regarding the first prong of the analysis, all circuit courts that have dealt with this issue[3] agree that, once plaintiff receives a loan from the USDA, §1926(b) protection attaches for the entirety of the term of the loan. Bell Arthur Water Corp. v. Greenville Utils. Comm'n, 173 F.3d 517 (4th Cir. 1997). The language in §1926(b) "during the term of such loan" makes it clear that Congress intended §1926(b) protection only so long as there is a loan outstanding. Id. at 523. All circuits also agree that once the debt is no longer outstanding, that protection is no longer

---

[2] Because Spanish Fort was unable to establish a substantial likelihood of success on the merits, or make a sufficient showing of irreparable injury, the Court "need not consider the remaining factors in the preliminary injunction test." GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers, 788 F.3d 1318, 1329 (11th Cir. 2015).

[3] The scope of §1926(b) provides protection to the entire water system of a USDARD loan recipient. Bell Arthur Water Corp., 173 F.3d at 524. In other words, once any part of a particular service has been financed, all aspects of the system associated with that service is fully protected by §1926(b) during the period of indebtedness, even if portions of the system were not constructed or improved using loan proceeds or pre-existed the loan. Id. And, relatedly, courts have noted that any doubts about whether a water association is entitled to §1926(b) protection should be resolved in favor of the indebted party seeking protection for its territory. Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow, 191 F.3d 1192 (10th Cir. 1999).

6

available because §1926(b) was meant to secure outstanding notes against default by protecting the income of the debtor and when indebtedness is retired, no such protection is needed. Id.

In this case, it is undisputed[4] that Spanish Fort received a USDARD loan of $6,703,207.00 with the final installment due on September 20, 2053. As such, §1926(b) protection attached and is available to Spanish Fort until the loan is no longer outstanding.

For the third prong of the analysis, "curtailed or limited services" has been interpreted to include annexation of the territory serviced or the imposition of conditions for service, such as the requirement of a franchise, license, or permit. Chesapeake Ranch Water Co. v. Bd. of Comm'rs, 401 F.3d 274 (4th Cir. 2005). Additionally, courts have found that physical intrusion into the service area of the protected entity by pipes, lines, or equipment of the offending entity also satisfy this prong. Jennings Water, Inc. v. North Vernon, 895 F.2d 311 (7th Cir. 1989). In this case, NBU's installation of an approximately thirty-foot section of twelve-inch line constitutes such a physical intrusion.

Regarding the second prong of the analysis, all circuits that have dealt with a §1926(b) protection issue require two sub-elements to satisfy that this is plaintiff's service area: (1) plaintiff must have the legal right to provide that service, dictated by state law, and (2) plaintiff must have the adequate infrastructure and facilities to provide service to the area in question and/or be able to provide such service within a reasonable time after a request for service is made. Green Valley Special Util. Dist. v. City of Schertz, 969 F. 3d 460 (5th Cir. 2020).

As stated, NBU claims that Spanish Fort does not currently have the physical capabilities to provide water service to the Brentwood development and is also unable to acquire the infrastructure and other equipment necessary for said service. Specifically, NBU points to the

---

[4] NBU does not dispute Spanish Fort's indebtedness to the USDARD. Doc. 13, p. 3.

fact that Spanish Fort has a three-inch water line in place, but a six-inch water line is required by the City of Spanish Fort to supply fire hydrants and, further, an eight-inch water line is required by the Brentwood development to supply its total water needs, including to supply fire hydrants.

To the extent that certain equipment is necessary to supply water to fire hydrants, the Tenth Circuit has held that §1926(b) of the CFRDA was enacted as a means to provide "safe and adequate" water services, not to provide fire protection. <u>Rural Water Dist. v. Owasso Utilities Authority</u>, 530 F. Supp. 818 (10th Cir. 1979). Therefore, a water association's ability to provide water for fire protection is "not a factor the court should analyze when determining whether the district has made service available." <u>Rural Water Dist. No. 4 v. City of Eudora</u>, 659 F.3d 969 (10th Cir. 2011). In other words, Spanish Fort's "ability to provide fire protection is simply not relevant to the specific question of whether [Spanish Fort] has adequate pipes in the ground to 'make service available' for purposes of the §1926(b) protection from competition." <u>Rural Water Sewer & Solid Waste Mgmt. v. City of Guthrie</u>, 654 F.3d 1058 (10th Cir. 2011).

Still, Spanish Fort maintains that it does, in fact, have the technical capability of providing sufficiently sized piping to the Brentwood development area, and further alleges that it has sufficient water capacity to serve the Brentwood development. However, given that this Court gives no weight to the expired 2003 contract regarding territory delineation, whether Brentwood – or any other area – is within the exclusive service area of Spanish Fort can only be determined by whether Spanish Fort has adequate facilities, or can construct adequate facilities within a reasonable time, to service the Brentwood area. To this end, given that Spanish Fort does not currently have the necessary infrastructure to service the Brentwood development – nor has it taken any significant steps to provide said infrastructure – this Court finds that Spanish

Fort has failed to meet its burden to show that they have a substantial likelihood of success on the merits.

### B. Irreparable Injury

But even if Spanish Fort could show a substantial likelihood of success on the merits, it has failed to show irreparable injury. The irreparable harm inquiry is a critical component of the preliminary injunction analysis and is considered the "*sine qua non* of injunctive relief." Northeastern Florida Chapter of Ass'n of General Contractors v. Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990). Proof of irreparable harm is an "indispensable prerequisite" to a preliminary injunction analysis, and where a party fails to carry the burden as to irreparable harm, it is "unnecessary to address the other prerequisites to such relief." Siegel, 234 F.3d at 1179. United States v. Jefferson County, 720 F.2d 1511, 1519 (11th Cir. 1983). See Northeastern Florida Chapter of Ass'n of General Contractors, 896 F.2d at 1285 (noting that the court did not need to address each element of the preliminary injunction analysis because it concluded that no showing of irreparable injury was made); See also Siegel, 234 F.3d at 1176 (stating that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"); See also Canal Authority of Florida v. Callaway, 489 F.2d 567, 574 (5th Cir. 1974) (stating that "where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate").

Irreparable injury "must be neither remote nor speculative, but actual and imminent." SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A., 243 Fed. Appx. 502, 504 (11th Cir. 2007) (per curiam). And, "prospective harm, by itself…does not meet the test of imminence." Id. Further, if an injury can be "undone through monetary remedies," it is not irreparable. Northeastern Florida Chapter of Ass'n of General Contractors, 896 F.2d 1283 at 1285. Clearly,

then, "economic losses alone do not justify a preliminary injunction." BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005).

As the Supreme Court stated in Sampson v. Murray:

> The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

415 U.S. 61, 90, 94 S. Ct. 937, 953 (1974).

Here, Spanish Fort claims that several alleged injuries created by NBU's potential future service to the Brentwood development area would constitute irreparable harm to Spanish Fort. First, Spanish Fort claims that not enjoining NBU will cause it irreparable harm in that such a decision would allow NBU to "deprive Spanish Fort of its exclusive service area," and encourage NBU to "intrude further south and…take away existing Spanish Fort customers," thus threatening Spanish Fort's ability to repay its debt to USDARD. Doc. 1, p. 8, 10. Spanish Fort asserts that such a significant loss of customers constitutes an irreparable injury in the Eleventh Circuit. But the cases Spanish Fort cites in support of this assertion are distinguishable from the one at bar.

Spanish Fort cites BellSouth as its authoritative source. BellSouth Telecomms., Inc., 425 F.3d 964. In that case, the court held that "although economic losses alone do not justify a preliminary injunction, 'the loss of customers and goodwill is an irreparable injury.'" Id. at 970. The record in that case demonstrated that plaintiff had been losing approximately 3200 customers per week and would continue to do so absent an injunction. Id. This determination supported the court of appeal's judgment that the district court's issuance of the preliminary injunction was not an abuse of discretion. Id. at 971. However, BellSouth is distinguishable from

10

the case at bar because in BellSouth the injury involved the loss of 3200 existing customers per week. Spanish Fort offers no similar evidence of losing existing, or even potential customers. To the extent that the loss of the 315 customers that will be serviced within the Brentwood area would affect Spanish Fort, that loss is purely monetary. And all water provided by any future water service delivered by NBU will be metered, making "revenues easily quantifiable," and thus making any damages for the loss of any customers accurately quantifiable, as well. Doc. 13-2, p. 27, Aff. Of Jason Padgett ¶ 9.

Further, the language cited by Spanish Fort in BellSouth in support of its claim that "loss of goodwill" would constitute irreparable harm is derived from Ferrero v Associated Materials, Inc., 923 F.2d 1441 (11th Cir. 1991). That case involved a preliminary injunction issued to enforce a covenant not to compete signed by appellant, Ferrero, after he was hired by appellee, Associated Materials. Id. The conflict arose after Ferrero wrote to his former employer that he intended to form a corporation and that he intended to compete with them. Id. The district court granted Associated Materials' request for a preliminary injunction to enjoin Ferrero from competing. Id. In the appeal that followed, Ferrero claimed that Associated Materials failed to show that it would suffer irreparable harm without the injunction. Id. The district court found that "should Ferrero be permitted to compete against Associated Materials, Associated Materials [would] lose its investment in good will and [would] lose its long-time customers," and that such an injury was "difficult, if not impossible, to determine monetarily." Id. at 1449.

However, the Court in Ferrero also found that while Associated Materials' products are "indistinguishable from the products of Associated Materials' competitors," Associated Materials attempted to distinguish itself in the industry by "cultivating customer good will through various incentives and quality service." Id. at 1443. Specifically, Associated Materials' sales strategy was

11

to create a "close relationship between its sales-force and its customers." Id. With the money invested on building Associated Materials' goodwill, Ferrero cultivated close relationships with the buyers for his ten largest accounts, which accounted for more than half of Ferrero's total sales and 40% of Associated Materials' total activity. Id. at 1443. Therefore, the nature of the "goodwill" lost in that case was unique and its loss would have been extensive. Not only had Associated Materials invested over $430,000 in the last 5 years to cultivate said goodwill, but it was also the distinguishing factor between Associated Materials and its competitors. The loss of such goodwill would put at risk Associated Materials' entire business model, its sales strategy, its trade secrets, and other legitimate business interests. These same factors are not present in Spanish Fort's case. There is no evidence of loss of goodwill or even any potential for loss of future customers.

Next, Spanish Fort claims that NBU's actions threaten the "safety and security of Spanish Fort's pipes" and would make "repairs, adjustments, replacements, expansions, and extensions eminently and needlessly more complex, expensive, and risky." Doc. 2, p. 20, Aff. Of John T. Evans ¶ 20. But Spanish Fort fails to substantiate this claim with any supporting evidence. But even so, the Eleventh Circuit in United States v. Lambert held that similar evidence related to the allegedly irreparable nature of the harm in that case that would make restorations "more difficult, more expensive, and more uncertain" was "insufficient in and of itself to require a finding of irreparable harm." United States v. Lambert, 695 F.2d 536, 540 (11th Cir. 1983). Further, any increase in complexity, time, and expense of any repairs, adjustments, replacements, expansions, and extensions have not been shown to be unquantifiable.

Next, Spanish Fort claims that "loss of control of reputation, loss of trade, and loss of goodwill," as well as the "possibility of confusion" constitute irreparable injuries. Doc. 21, p. 4.

12

But the cases Spanish Fort cites in support of this assertion are also distinguishable from the one at bar. Specifically, Spanish Fort cites Sylvan Learning Inc., a case involving a trademark infringement claim, which arose from the termination of a license agreement between the parties. Sylvan Learning Inc. v. Learning Solutions, Inc., 795 F. Supp. 2d 1284 (11th Cir. 2011). In support of the loss of reputation, trade, and goodwill as an irreparable harm, the Eleventh Circuit in Sylvan Learning Inc. cited Ferrellgas Partners, L.P. v. Barrow, 143 Fed. Appx. 180, 190-191 (11th Cir. 2005), another case involving trademark infringement, which, in turn, cited Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir.1998), which, in turn cited Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187 (3rd Cir. 1990). In Opticians Ass'n, the Third Circuit held that "potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." Id. at 196. See Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir. 1985) (holding that irreparable injury "exists in a trademark case when the party seeking the injunction shows that it will lose control over [its] reputation"); See also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir. 1988) (holding that the "most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods").

      Further, Spanish Fort cites Sylvan Learning Inc. in support of its claim that "the possibility of confusion" also constitutes irreparable harm. Doc. 21, p. 4. However, this type of "confusion injury" is exclusive to trademark infringement cases. As the Eleventh Circuit in Ferrellgas Partners, L.P. stated, "a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may by itself constitute a showing of . . . [a] substantial threat of

irreparable harm." 143 Fed. Appx. at 191. However, the case at bar is clearly not a trademark infringement case.

Next, Spanish Fort claims that not enjoining NBU will allow NBU to remain in continual violation of §1926(b) of the CFRDA. Doc. 1, p. 10. However, the only area where Courts have said that an "on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence." <u>Northeastern Florida Chapter of Ass'n of General Contractors</u>, 896 F.2d at 1285. This is evidently not such a case, as it involves neither a first amendment issue nor a right of privacy claim, and the damage to Spanish Fort here is "chiefly, if not completely, economic." 896 F. 2d at 1286. Further, while the continual water service of NBU to the Brentwood development might make calculating damages more complicated, that "difficult damage calculations 'may' occur is not enough" to satisfy the irreparable harm inquiry, and "conjecture about a possibility of difficulties with damage computations is inadequate to support" a motion for preliminary injunction. <u>Id</u>.

Still, Spanish Fort cites to several cases in support of its assertion that threatened additional violation of §1926(b) by NBU constitutes irreparable injury. However, the cases Spanish Fort cites in support of this assertion are distinguishable from the one at bar. Most[5] of the cases cited deal with requests for <u>permanent</u> injunctions, which require a different analysis

---

[5] <u>Rural Water Dist. No. 5 Wagoner Cnty. v. City of Coweta</u>, 202 F. Supp. 3d 1268 (10th Cir. 2016); <u>Rural Water Sewer & Solid Waste Mgmt. v. City of Guthrie</u>, 654 F.3d 1058 (10th Cir. 2011); <u>Rural Water Dist. No. 4 v. City of Eudora</u>, 659 F.3d 969 (10th Cir. 2011); <u>Crystal Clear Special Util. Dist. v. Marquez</u>, 316 F. Supp. 3d 965, (5th Cir. 2018); <u>Jennings Water, Inc. v. North Vernon</u>, 895 F.2d 311 (7th Cir. 1989). All of these cases dealt with permanent, not preliminary, injunctions.

than the one given to preliminary injunctions. Further, the two cases[6] that Spanish Fort cites that do, in fact, concern preliminary motions are distinguishable from the one at bar.

Spanish Fort first cites City of Coweta in support of its claim that threatened additional violations of §1926(b) would qualify as an irreparable injury. Rural Water Dist. No. 5 Wagoner Cnty. v. City of Coweta, 202 F. Supp. 3d 1268 (10th Cir. 2016). In that case, a previous jury trial found that plaintiff – a USDA loan recipient – made water service available to the disputed area and customers. Id., at 1271. As such, the court held that, for as long as plaintiff remained federally indebted, a new violation of §1926(b) would occur in the future every time defendant would provide water service to a disputed customer, which would potentially require plaintiff to file multiple lawsuits to obtain monetary damages caused by such service. Id. at 1277. If the defendant were to continue to provide service to disputed customers, the court explained, the economic loss to plaintiff would vary depending on the number of residences and volume of water supplied by defendant, thus making future damages not reasonably capable of calculation. Id. However, the court in that case hinged its holding on the jury finding that the disputed area was, in fact, part of the water association's exclusive service area. But, unlike City of Coweta, there has been no such finding in this case. Further, the request in that case was for a permanent injunction – not a preliminary injunction like the one Spanish Fort seeks. Id.

The court in City of Guthrie and in City of Eudora reasoned the same. Rural Water v. City of Guthrie, 2016 WL 126877; Rural Water Dist. No. 4 v. City of Eudora, 659 F.3d 969. Both of those cases had jury determinations that the defendants were, in fact, in violation of

---

[6] Mississippi Rural Water Association, Inc. v. Mississippi Public Service Commission, 2014 WL 12540566 (5th Cir. 2014) and Ross County Water Company v. City of Chillicothe, 2009 WL 10679057 (6th Cir. 2009) deal with preliminary injunctions but are distinguishable from the case at bar.

§1926(b). As such, the court determined that, if the defendant continued to provide water service to the disputed customers, plaintiff would continue to suffer an economic loss each month and multiple suits would have to be filed to enable plaintiff to recover its ongoing damages, which would fluctuate based upon the number of customers and the volume of water purchased by those customers. However, as above, the court in those cases hinged its holdings on the jury findings that the disputed area was, in fact, part of the water association's exclusive service area. But there has been no such finding in this case. Further, the requests in those cases were also for permanent injunctions – not a preliminary injunction like the one Spanish Fort seeks.

Spanish Fort also cites to Crystal Clear Special Util. Dist. v. Marquez, 316 F. Supp. 3d 965 (5th Cir. 2018). In that case, the court found that plaintiff had "provided or made available" its service in the disputed area. Id. at 971. The court further found that plaintiff had shown that it is entitled to the protections of §1926(b), that the decertification involved in that case violated §1926(b), and that plaintiff would lose annual revenues as a result of the decertification, which would make it difficult to repay its federal loan. Id. at 978-79. Again, this case is distinguishable from the one at bar because this Court has made no determination that the Brentwood development is within Spanish Fort's exclusive service area. Further, the request in that case was also for a permanent injunction – not a preliminary injunction like the one Spanish Fort seeks here. Id. at 978.

Spanish Fort further cites to Jennings Water, Inc. – another case where the court dealt with a request for a permanent injunction. Jennings Water, Inc., 895 F.2d 311.

Next, Spanish Fort turns to Mississippi Rural Water Association, Inc. v. Mississippi Public Service Commission, 2014 WL 12540566 (5th Cir. 2014). While that case did, in fact, deal with a motion for a preliminary injunction, it is still distinguishable from the case at bar. In

that case, the defendant public service commission sought to exempt customers or applicants that had been determined to be a victim of domestic violence by a domestic violence shelter from the public utilities' "initial deposit requirements." Id. at 1. The court established that the area in question was part of the plaintiff water association's "exclusive certificated area," and further held that allowing such an exemption would create an immediate risk of "permanent financial ruin" for all rural water associations, and that some associations would "totally lose their viability when faced with charges of violating" the new exemption. Id. at 4, 6. However, unlike Mississippi Rural Water Association, Inc., this Court has not determined that the disputed area is within Spanish Fort's exclusive service area, and Spanish Fort has proffered no evidence to show that not enjoining NBU would put them at an immediate risk of "permanent financial ruin."

Finally, Spanish Fort turns to City of Chillicothe. Ross County Water Company v. City of Chillicothe, 2009 WL 10679057 (6th Cir. 2009). While that case also dealt with a motion for a preliminary injunction, it is also distinguishable from the case at bar. In City of Chillicothe, the Court found that the defendant's actions of installing water lines in the same right-of-way as the plaintiff water provider threatened "substantial interference with [plaintiff's] existing lines by eliminating [plaintiff's] ability to place taps on its own lines." 2009 WL 10679057 at 9. Thus, the court held that plaintiff "would be unable to serve customers adequately and efficiently," and found that, absent an injunction, plaintiff would "suffer not only monetary loss, but portions of business opportunity to which it is entitled." Id. However, Spanish Fort has not proffered any evidence to show that NBU's water lines have substantially interfered with their own. Further, Spanish Fort is not in a position where NBU could threaten its ability to serve customers "adequately and efficiently" since Spanish Fort currently has no existing customers in the Brentwood development area.

Last, Spanish Fort asserts that there is "no adequate remedy at law to prevent the harm that will ensue should NBU be allowed to continue" with its plan to service the Brentwood development area. Doc. 2, p. 11. Because a preliminary injunction is an "extraordinary remedy, it is available not simply when the legal right asserted has been infringed, but only when that legal right has been infringed by an injury for which there is no adequate legal remedy." Alabama v. United States Army Corps of Eng'rs, 424 F.3d 1117, 1127 (11th Cir. 2005). While it is well-settled that a preliminary injunction is available only in the absence of an adequate remedy at law, the "critical question is whether there exists an adequate remedy at law, not whether the moving party prefers one remedy to another." SME Racks, Inc., 243 Fed. Appx. at 503-504. And, only those injuries that "cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." Canal Authority of Florida, 489 F.2d at 573. But Spanish Fort has not explained why an award of economic damages would not be an adequate remedy at law for its alleged injuries. And, importantly, Spanish Fort claims that not enjoining NBU will "cause Spanish Fort *great economic damage*," thus admitting that it is mostly, if not entirely, seeking economic damages. Doc. 2, p. 10. (Emphasis added).

In this case, any harm suffered is "financial, and monetary compensation [would] make [Spanish Fort] whole if [Spanish Fort] prevails on the merits." Bluefield Water Ass'n Inc. v. City of Starkville, Miss., 577 F.3d 250, 253 (5th Cir. 2009).   In sum, the loss of new customers within the Brentwood development area, the potential loss of revenue due to unavailability, or delayed availability, of services created by NBU's presence in the Brentwood development area, and any increase in expenses for repairs and other changes created by NBU's actions are all economic in nature and, therefore, redressable through economic damages.  Given that an injury that can be "undone through monetary remedies," is not irreparable, this court finds that Spanish

Fort has not met its burden of persuasion as to this prerequisite. SME Racks, Inc., 243 Fed. Appx. 502.

### III.    Conclusion

Based on the foregoing, Spanish Fort's Motion for Preliminary Injunction is DENIED.

DONE and ORDERED this the 1st day of August 2022.

                                  s/ Kristi K. DuBose
                                  KRISTI K. DuBOSE
                                  UNITED STATES DISTRICT JUDGE